10-06-83 people v. Richard O. Rhinehart. Good morning. We don't have a fast rule in this division. Usually the parties will take 15 or 20 minutes to make their argument. If you need more time, we'll give you more time. We do ask you to go and give me more time if you need it, that you don't repeat yourself. We have certainly read the briefs. We've read most of the cases. If you have some cases that you bring up that we have not read, we will certainly consider those cases before we give any ruling. State your name and tell me how long you think you'll take. I'm Benjamin Wimmer. I was planning on 15 minutes. Certainly I want to do more than 20. Adam Delterfield on behalf of the people. It really depends on how many issues are raised during defense counsel's argument. Okay, great. You may proceed. Counsel, what's your name for the record? Adam Delterfield. Okay, thank you. Your Honor's ready? Yes. All right. May it please the Court, Benjamin Wimmer on behalf of the defendant, Christian Rhinehart. I'd like to reserve two minutes for rebuttal. This case concerns rights that are important precisely because they're so basic, simple, and easy to respect. Chicago police officer Keith Califutt received a tip of a man with a gun from an unidentified woman who approached him somewhere on the street. He immediately drove to another location, approached my client, Mr. Rhinehart, frisked him, and found a gun in his waistband. Mr. Rhinehart was convicted of aggravated unlawful use of a weapon and defacing the identification marks on a firearm. But Officer Califutt violated Mr. Rhinehart's Fourth Amendment right against unreasonable seizures by speeding off to detain and frisk him without first asking the unknown and unaccountable informant the obvious questions who she was, how she could be located again, or how she had come by the information that she was providing. Then at trial, the State failed to present any evidence that Mr. Rhinehart possessed the loaded gun off his own land, a necessary element of aggravated UUW, or that Mr. Rhinehart knew that the serial number on the gun had been defaced, a necessary element of defacing a firearm. Both because the State failed to prove him guilty beyond a reasonable doubt and because the evidence it did present was obtained through a violation of the Fourth Amendment, this Court should reverse outright both of Mr. Rhinehart's convictions. And Mr. Rhinehart presented five claims in his briefs. I'm planning on addressing the first three today, although, of course, I'll be happy to answer any questions the Court has about any of the claims. How does this case differ from People v. Miller? Well, it differs in a couple ways from People v. Miller. First of all, in Miller, the gun in that case was actually produced not by a frisk, but after the defendant had escaped from the police that had been attempting to frisk him. It fell out of his waistband while he was running away. As a result of that, I don't think that the Miller case actually presented to that court a straightforward issue of the legality of the search. Secondly, the Miller court wasn't presented with a precise comparison of the risk of consequences for a false tip to an anonymous telephone informant and an informant that gives a tip in person that Mr. Rhinehart is presenting in this case. Do you maintain that the informant was anonymous? In the technical meaning of that term, sir, yes. If you're going to say that an anonymous tip requires corroboration. Anonymous to the extent that his name was mentioned or the officer didn't know his name. But, in fact, he was identified. He's a citizen who stops a police officer on the street and says, I have some information about a man with a gun. That's not – is that anonymous? It's anonymous. If what we're saying is that an anonymous tip is one that requires corroboration in order to support reasonable suspicion for a search, it is anonymous in that sense for the reason that the purposes of this anonymity rule are that the police have to have some reason to believe that an informant is telling them the truth before they simply assume that he or she is. For instance – Are tips by citizens generally considered to be reliable? They're generally considered to be reliable when the police knows who the person is or otherwise has a way of potentially imposing consequences on this person for a false tip. Are you talking about a confidential informant when you talk about people that the police know? No, Your Honor. That's a different situation. A confidential informant is, you know, somebody who the police know who they are, know who to find them again. They just simply don't want to reveal that information to the public. Let me ask you this. What case best supports your position? The case that best supports our position is the United States Supreme Court's decision in Florida v. J.L. Now, that case did involve an anonymous telephone informant, but what's important in J.L. is the logic behind the rule that the court created. The court indicated that for two reasons, the telephone caller in that case, the police could not simply assume that the caller was telling the truth. First of all, because the police did not know the informant's identity. Of necessity, the informant didn't have a history of reliable tips, so the police had no evidence that this person had a tendency to tell them the truth. Second, because the police had no reliable way of locating this person in the event that the tip proved false, the informant faced no serious risk of consequences in the event that the tip turned out to be false, and consequently, the police had no reason to simply assume that the informant had an incentive to tell them the truth. In other words, that there was a risk to the informant if the informant wasn't telling the truth. Now, all of those factors, at least one of those factors, is satisfied in the case where just an average citizen steps forward on the street and the police have some way of locating the person again, such as the person offers their name. It's clear where a person's working because, in that case, in the event that the tip turns out to be false, the informant's potentially subject to criminal liability. It's a crime in Illinois and in most states to give materially false information to the police. Would it make any difference, different than J.L., the facts in this case, that the individual, I believe, indicated that the defendant had a black gun, that he alluded to the fact that he saw the gun and that, in fact, the individual did have the gun on him, that was described by the person talking to the police officer? Well, it shouldn't make a difference, Your Honor. In either case, it doesn't – what matters is whether in advance, before conducting the search, the police have a reason to believe that the informant has some reason to tell the truth. Obviously, any sort of corroboration that you get after conducting the search, as a result of conducting the search, doesn't establish that you had reasonable suspicion to conduct the search beforehand. But by identifying the gun as black, hasn't the informant advised the police that he has some information about the illegality? He didn't just say gun. He said a black gun. Well, I mean, this is also relevant to the second way in which the tip in this case was insufficient. So let me address two ways in which this affects the reliability of the tip. First of all, because the police just didn't know who this person was and had no reason to assume that the informant was telling the truth, in that sense, no amount of detail that the informant gave the police, unless it was supported by corroboration before the search was conducted, gave the police any reason to believe that the informant was telling the truth, regardless of how much detail the informant provided. Any of it could have just been made up. Now, on a second issue, even assuming that the informant had been otherwise shown to be reliable, for instance, by facing a significant risk of consequences if the tip turned out to be false, there's another problem with the tip in this case, which is that the informant did not display her basis of knowledge, how she knew that she had the gun. Now, you're asking, does the fact that the informant said that there was a black handgun indicate to the police that she was saying basically that she saw the handgun? And no, not explicitly. Somebody could have told her that it was a black handgun. And also, you know, most guns come in two flavors. They're either black or nickel-plated. It's not much of a stretch that if she assumed that she had a gun, that Mr. Reinhardt had a gun for some reason, she'd believe it was black. Counsel, can you distinguish this case, our case, from People v. A.V.? Yes, Your Honor. How would you do that? Okay. Well, the A.V. case, similar to this case, did involve tips given by, you know, unidentified people on the street about a handgun. But the important difference, and what the Miller Court failed to recognize, is that in A.V. the police received not one tip but six tips from different people the course of less than a minute that a person 200 feet away was displaying a gun. Now, the existence of multiple informants works to establish the reliability of these defendants in the ways that the Supreme Court in J.L. found important in a way that one informant would not be reliable. Now, first of all, because there's six informants all giving the police the same story, although none of these informants individually have a history of reliable tips, the fact that they're all corroborating each other suggests to the police that they're likely giving the police a true story. Although one, you know, false tip is, you know, it's possible, six in a row is beginning to get increasingly unlikely. Second, because there were six tipsters, and because the search was conducted such a short distance away from where the police were receiving the tips, initially 200 feet, and the police indicated that some of the tipsters came forward while they were driving towards the search, so potentially less than 200 feet, the police had reason to believe that even if not all of the informants would still be available if the tips turned out to be false, at least some of them probably would be. And because of that, the police had reason to believe that if not all, at least some of the informants had a reason to fear consequences in the event that they gave a false tip, and hence an incentive to testify truthfully. And as soon as one of those informants has an incentive to testify truthfully, that's enough for the police to, you know, reasonably conclude that the person's telling the truth and conduct a stop and investigation based on that basis. But in this case, because there was only one informant, neither of those factors was present. Because there was only one informant without a history of reliable tips and no corroboration from other tipsters, the police had no reason to simply assume that the informant was likely telling the truth. And because there was only one informant that they drove away from, getting well out of sight by the time of the search, there was no reason to assume that the defendant feared reasonably that there was a significant chance that the informant would face consequences in the event that the tip turned out to be false. So for both of those reasons, the existence of multiple informants in A.V. was a critical distinction between A.V. and the present case. Now, I want to stress that Mr. Reinhart isn't arguing here that there's some sort of rule that the police need to be able to get a name or an address from an informant in every case. As indicated here with this discussion of A.V., any factor that reasonably gives the police reason to believe that an informant is telling the truth, either a history of reliable tips, that the informant can be located again in some way, or anything else is sufficient to establish reason to believe the informant and therefore reasonable suspicion. And there could be a lot of other ways that that could be done. For instance, if an informant were seen mowing a lawn or painting a house before they came over to get the tip, the police would have reason to believe that there was some sort of connection to that location. People don't generally do chores just out of the goodness of their heart for strangers. They'd have reason to believe that person either lived there or worked for somebody there or knew somebody there and would give them a place to start with their investigation. Similarly, even if the police don't know precisely where to find somebody, but let's say the police work a beat in a regular area and they know somebody by sight. They don't know their name, but they recognize their features. It's somebody they've seen around multiple times. Because they've seen them around multiple times, even though they don't have their name, they have reason to believe they can probably run into this person again because it's happened multiple times before. But in this case, the police offered none of that testimony. It was just a person who they didn't know that approached them somewhere on the street. Since we're talking about the location, the state makes the argument that this was a high crime area. What do you say about this? Well, Your Honor, I mean, multiple things. First of all, it's established – one moment. You're going to the Supplemental Authority. Yeah, yeah, the Supplemental Authority. Sorry, Your Honor, the case name wasn't quite branded in my mind yet. People v. Harris. established a reasonable rule that there should be more than conclusory testimony required in order for the state to demonstrate, for purposes of admissibility of testimony, that an area was a high crime area. Otherwise, there's too much risk of potential abuse by the police and also the notion of a high crime area being used as a proxy for other socioeconomic factors. So you're taking the position that the police officer didn't provide sufficient facts to explain why this was a high crime area? Yeah, and without the testimony, the court can't simply assume that those facts would have been available. Even leaving that aside, Your Honor, regardless of whether or not the area was a high crime area, the fact that the area was a high crime area would do nothing to specifically corroborate the unidentified and unaccountable informant's tip that Mr. Reinhart had a gun. But I think the state's position is this justified the Terry stuff because of the area they were in. Your Honor, I just don't, A, see precisely that argument in the briefs, and, B, I mean, the argument's just not sound. You can't risk anybody that you encounter in a high crime area, you know, regardless of whether or not you have a tip. But after receiving this information from the citizen, then they go to the area, see that individual. They know it is an area that they consider to be a, quote, high crime area. So they conduct the Terry stuff. Well, Your Honor, I mean, if the tip were otherwise reliable, it wouldn't be necessary for the area to be a high crime area. If the police had reasonable suspicion to believe that Mr. Reinhart had a gun, they could have stopped him, you know, anywhere. You know, he's in the most crime-free of neighborhoods, and still stopped him and frisked him. If they had reason to believe that he possessed a gun, that would mean that he was potentially dangerous and that the police needed to protect themselves from their own safety. The problem here is simply that the tip itself was not reliable, and Mr. Reinhart's presence in a high crime area was not sufficient to corroborate the specific information that was provided by the informant and give the police a reasonable suspicion that he actually did have a gun. And, you know, for both of these reasons, the fact, first of all, that the tip came from an unidentified, unreliable informant, and secondly, because the tip did not reveal its basis of knowledge, Mr. Reinhart's conviction, any evidence that was produced as a result of the frisk, including Mr. Reinhart's possession of the gun, all the statements that he made to the police about the gun afterwards, should have been suppressed in this case and should be suppressed at any retrial. And because of that, any sort of retrial in this case, if this Court decides in Mr. Reinhart's favor on this claim, would be pointless. I don't know what other evidence the State could hope to present or expect to present at a retrial, but unless the State explains what sort of evidence the State thinks it could present, a retrial would just be pointless. And this Court should, because of the Fourth Amendment violation, reverse both of Mr. Reinhart's convictions outright. Now, moving on, even to the Mr. Reinhart's second claim regarding the unauthorized use of a weapon conviction, the State failed to prove him guilty beyond a reasonable doubt, because it did not offer proof that Mr. Reinhart was not on his own land at the time he possessed the gun. Now, that is an element of the offense that the State has to prove beyond a reasonable doubt, established by the Illinois Supreme Court in People v. Loudsher in 1998. Now, the only evidence that the State presented about Mr. Reinhart's location at the time of the frisk was that after Officer Caliphate drove to the 2100 block of South Millard Avenue, Mr. Reinhart was on the 2100 block of South Millard Avenue, and that alone does not establish beyond a reasonable doubt where on the block Mr. Reinhart was, whether he was in a building, whether he was on a lawn, whether he was on a sidewalk, or whether he was in the street. And the meaning of this English phrase in this context should be clear and can be seen from a number of basic thought experiments revealing our intuitions about how we use the words. This courtroom is on the 100 block of North LaSalle. We right now are on the 100 block of North LaSalle. It would not be unusual to say that, and that statement would be true. Further, imagine in this case, if after the police had received the same tip that they did in this case, Officer, there's somebody on the 2100 block of South Millard Avenue who has a gun. Police say they'll go check it out. They drive over, discover a guy sitting in a lawn chair on his lawn, holding a black handgun and sitting next to a sign saying, you know, the Don't Tread on Bean flag and the sign saying United Nations out of Chicago. Would the informant have been lying? No. The police would have found something that matched what the informant said that they could expect to find, a person on the 2100 block of South Millard Avenue who had a black handgun. What was the address of the arrest? That's not clear from the record evidence at trial, Your Honor. The Officer Caliphate did not testify precisely in front of which house he was at the time of the arrest. Now, because of this, the trial court's assumption that by on the block, Officer Caliphate meant to testify that Mr. Reinhart was specifically on the sidewalk or on the street, it just wasn't a reasonable conclusion in light of the, you know, the English phrase that he used. Or, assuming that the court was following the prosecutor's unsupported suggestion, that, in fact, Mr. Officer Caliphate was testifying in some sort of, you know, nonstandard dialect of English, there was nothing to support that in the record. Either way, there was just no evidence that Mr. Reinhart was not on his own lawn. The State failed to prove beyond a reasonable doubt that he was not on his own land at the time of the offense. Furthermore, even assuming that there was some proof offered that he was on the sidewalk or in the street, under Laubscher, you're on your own land, even if that land's accessible to the public, if you have some sort of fee interest in the land. And because there was no proof that Mr. Reinhart was not in front of his own house, he could have been on sidewalk or street that he owned in fee simple under a common law dedication. For both these reasons, there was no proof that Mr. Reinhart was not on his own land and no proof beyond a reasonable doubt that he was guilty of aggravated UUW. And that conviction should be reversed. Moving on to Mr. Reinhart's third claim, the State failed to prove him guilty beyond a reasonable doubt of defacing a firearm because the State offered no proof that he was aware that the serial number on the gun was defaced. Now, the statute under 720 NLCS 5-24-5B states that as the elements of the offense that a defendant has to possess a gun with defaced identification marks, and specifically the serial number on the receiver, which is more important than any other identification marks. Under Illinois rules of statutory construction codified at 720 NLCS 5-4-3A, unless a statute clearly evidences an intent to create an absolute liability offense, there must be implicitly, the statute must implicitly be read to require a mental state for every element of the offense. Now, because Section A of the – subsection A of the defacing a firearm statute indicates that intent or knowledge are sufficient, implicitly that is the standard that is applied to every element of the offense. So there must at least be knowledge of the defendant that every element of the offense is satisfied. And that means in this case knowledge that the serial number on the handgun was defaced. Now, we've acknowledged that there is a case to the contrary in the Illinois appellate court, People v. Stanley. But Stanley simply reached a conclusion that's contrary to basic due process laws established by the United States Supreme Court in Apprendi. Under Apprendi, any fact that needs to be proved in order to increase the punishment on a criminal defendant is an element of the offense that has to be proved to a jury beyond a reasonable doubt. And the Stanley court, by saying that there could be a fact which bore on the commission of offense without being an element of the offense, was simply trying to recreate that category of, you know, sentence enhancers that the Apprendi court said was not consistent with the Constitution. This Court should not follow Stanley. It should follow Apprendi and hold that proof of knowledge that the serial number was defaced was required in this case. Furthermore, mere possession of the gun enough is not enough to permit a reasonable fact finder to conclude beyond a reasonable doubt that a person with the gun knew that the marks on the gun were defaced. Now, this basic rule is established by the Illinois Supreme Court in the case People v. Greco, saying that possession alone cannot support a permissive inference that the defendant knew of the illegal status of some contraband that he owned, unless if there's corroboration from additional evidence, it makes it more likely than not that the defendant knew, or if there's no corroboration, unless it proves beyond a reasonable doubt on its own that he knew. And comparing this case to the rule established in Greco, there's no reason to conclude that a person who merely possesses a gun knows anything about serial numbers on a gun or would specifically look at the gun and see the defacement. And the State presented no additional evidence in this case that Reinhart would have looked at the gun, did look at the gun, in this case should have been aware of the fact that the serial number was defaced. And it would have been extremely easy for the State to do so. They have the gun and likely will have the gun in any case of this sort. All they have to do is offer it into evidence. Let the fact finder see for itself what those marks look like and whether somebody is likely to take notice of them. They don't want to put the gun in the jury room. All they have to do, take a ruler, put it next to the gun, take a Polaroid. The jury can see for themselves. Now, in this case, there was no such evidence presented to the jury. There was no testimony regarding the size of the mark and how likely it would be for somebody to notice it. In light of that, the State did not prove beyond a reasonable doubt that Mr. Reinhart was aware the serial number on the gun was defaced. And that conviction must be reversed. And unless the Court has any other questions at this time, I'd like to reserve the rest of my time for rebuttal. All right. Thank you, Your Honors. Thank you, Your Honor. May it please the Court, Assistant State's Attorney Adam Delfield appearing on behalf of the people. The defendant has argued this morning three points, and the people would respond to them in the order raised. Prior to the stop of defendant, a concerned citizen approached officers and informed them that a black male in yellow pants and a white shirt with a black gun was at a particular location. As expected, the officers took that information and went to the location where they found defendant in the particular outfit, yellow pants and a white shirt. When they approached, they had cause to stop him there under People v. Miller. But in this case, in addition to that, defendant was with another man who proceeded to flee through the high crime neighborhood. And one officer had to break away to chase him, while the other officer, Officer Caliphate, proceeded to stop defendant and perform a protective pat-down. Under Lindley, there's authority to say that when there's an imminent threat to the public safety, there's a lesser need for corroboration. Furthermore, in this case, there's a concerned citizen, who under Miller is presumed to be reliable. What's the threat to the public safety? Well, you have a man who apparently is armed with a gun on a public way and a chase is breaking out through a high crime neighborhood. So the imminent threat to public safety would be just this high-risk situation and the fact that this is fundamentally a gun crime on a public way. So you're going to impugn the conduct of a man who's standing next to the defendant simply because he happens to flee? Well, this man, later identified as defendant's brother, was not simply in the proximity of defendant. These people were with each other. But at the time the police saw him flee, they didn't know the connection, did they? They didn't realize they were brothers. They did not know they were brothers, but they did know they were with each other. Simply by driving up and seeing them, they were aware that they were with each other? The officer said upon arriving that the defendant was with another man, and certainly the trier fact in this case found they were with each other. And certainly it's a reasonable inference that if you see two men who are in each other's company, you can understand that they're in each other's company. And when the officers approached the two men and announced their office, with their badges clearly showing and their vest and their gun was visible, the man ran away. You refer to this as a high crime area. Right. Your opponent says this is just a conclusion. Did the officer provide the court with any underlying facts that would permit the court to come to that conclusion? Well, the officer didn't give sort of a background history of the neighborhood or the crime rates of the neighborhood or whatnot, but the officer did clearly testify that this was a high crime neighborhood. And the supplemental authority that defense counsel now cites, Harris, would not appear to hold that the officer is required to give all this additional information. Harris was a state appeal where the trial court explicitly held that the officer had failed to show it was a high crime neighborhood. So the trier effect in the lower court had already found that it wasn't a high crime neighborhood, and this was a state appeal with the burden against the people on appeal. And furthermore, in Harris, there was no concerned citizen giving the information. Harris is a much different case, and the burden is on the other foot in Harris. It doesn't apply to the instant case here. But when we start talking about a high crime area, to that extent it does apply, because you're using that to support your position. That justifies the search. You said it's a high crime area, correct? Well, certainly we are saying it's a high crime area, and already they have the ability to stop the defendant when they've approached before the man ran under people v. Miller. But this is just additional on top of that for this particular case. And Harris does not apply because Harris is not holding that you need the extra information. Harris was a case where the trier effect clearly rejected the idea that this was a high crime neighborhood when the officer presented it. So the finding of fact was it wasn't. And then the people were on appeal, and the burden was on them. So it's a much different case. We're saying that Harris doesn't hold that the people need to show this additional information of it being a high crime neighborhood. So then there was no other information given that this was a high crime area other than the police officer stating that? Correct, Your Honor. The testimony at this trial was just the police officer saying that, of course, the officer also introduces himself and, of course, has his experience and whatnot. But, right, the officer is just testifying that this is a high crime neighborhood. And also the defendant, when the officers identified themselves as police officers, the defendant did not try to flee, and did he not walk over to the officers? Right. Defendant did not attempt to flee. It was defendant's companion who fled. Okay. So you tell me then how this case differs from J.L. J.L., I know, was an informant who caught up on the phone. This instance was somebody was on the street. They flagged down the officer. How does this fact pattern differ from J.L.? Well, J.L., as you just now mentioned, Your Honor, J.L. was a phone call, an anonymous tip over the phone. And case law clearly distinguishes, as explained in the people's brief, that a concerned citizen who comes face-to-face with the officer on the street is presumed reliable, especially compared to a completely anonymous person who just calls up over the phone. And, furthermore, J.L. is distinguished because in J.L. the phone call, the tip was made, but the time frame of when it was responded to and who received it and the whole procedure of how the tip was received to when the man was stopped was completely unclear. And, furthermore, in J.L. the description was simply a man with a plaid shirt. Here you have a distinctive outfit. The attire was yellow pants with a white shirt. And the trier of fact clearly found that to be a distinct outfit. And so, J.L., really the quality of the tip as an anonymous phone caller was distinguished in many cases from the one here where it's a concerned citizen face-to-face. And just the nature of what was the information given and how the police respond to it is all different. So, really, J.L. does not really seem to apply in this case. And what this Court should really look to is people v. Miller in recognizing that there's a reasonable, articulable basis of suspicion to perform the stop, and given the nature of the stop, a gun crime and a high-crime neighborhood, and also just an imminent threat to public safety, altogether there's a reasonable safety reason here to perform the protective pat-down. So, certainly the trial court was right in denying this motion to quash arrest and suppress evidence. And this is a fundamental matter. Defense counsel mentioned that there's no need to remand this. As mentioned in the people's brief, we agree that it wouldn't need to be remanded. But if this Court were to agree with defense counsel, as mentioned in the people's brief, the proper remedy would be to remand, not to just reverse outright under people v. Olivera, even though defense counsel maintains that there would not be enough evidence to sustain the conviction, should this be granted. If we suppress the gun, then what evidence are you going to produce on remand? Well, certainly I wasn't the trial prosecutor on this. I'm not aware of all the evidence that wasn't introduced. That's what he's charged with, right? That is what he's charged with. But under people v. Olivera, the analysis is to simply remand it. Even if the evidence would not sustain the conviction, if this were to be quashed, the proper remedy is to remand under people v. Olivera, and that is what this Court would need to do under that case law. But the people, of course, maintain that this stop was completely valid under people v. Miller, and there's certainly no need to reverse or remand at any rate. Defense counsel next raised a reasonable doubt argument against his conviction for aggravated and lawful use of a weapon. In defense brief, of course, he raises two, but an oral argument he today raises only that the people did not prove beyond a reasonable doubt the defendant was not on his own property. In terms of this Court is to view the record in the light most favorable to the people and give the proper deference to the findings and credibility determinations of the trial of fact. Where defense counsel says that this Court should simply disregard the understanding of the trial court as to what on the block meant and impose his own personal understanding that on the block meant it could be on your own property, that's just not a valid path to go down, and defense counsel cites no authority for that. In terms of what the trial of fact understood here, it was clear that on the block was understood to mean the defendant was on the block, out on the block. If, for example, a person saw someone on the block in this context and with this witness, the trial of fact clearly understood this to mean that he was on the public way, and that's how this Court should interpret that term in line with the trial of fact. Did the defendant live on that block? Although it's not in the testimony of the case, the defense counsel did cite in his opening brief, and it's not evidence, but the arrest report did mention that he lived on that block, although at a different address outside of one that he was arrested on. But the people only raised that arrest report in their brief to set the record straight. It's not actually evidence. There was no testimony regarding the specific address of defendant's residence. Is it accurate to state counsel that when we talk about on the block, we don't know exactly where the defendant was arrested? If it was on his land or on the public way, do we really know? Well, the understanding of on the block is that he's on the public way. And in being on the public way, under People v. Kelly, which is again cited in the people's brief, you only need circumstantial evidence to show the defendant is not on his own property. And to be on the road or the public way, that's sufficient circumstantial evidence. And the case the defense counsel is relying on here, People v. Laubscher, that case was one where defendant was explicitly, as shown by the testimony, on the lawn of the residence. It was an apartment building, I suppose, but he's on the front lawn of it. So in that case, clearly it wouldn't be enough to just have the circumstantial evidence. Well, you don't have the circumstantial evidence that he's on a public way. You have him on a lawn. And there needs to be some sort of direct evidence showing that he's not on his own property or hasn't got the property interest in that lawn where he lives. Here, this is much more in line with the holding in People v. Kelly, and that general case law that says you just need to show circumstantial evidence and it's sufficient to show that they're on the public way. You don't need to show, there's no, defense counsel would be creating a new legal requirement for direct evidence if the people had to go get property plats for public streets and public roads to show that defendant didn't own them. That requirement doesn't exist. It's just circumstantial evidence is sufficient, and here you have defendant on a public way. Help me out for a second. Was this defendant in front of his house or next to his house? Again, Your Honor. Even though he was on the block, was he on the block in front of his house or right next to his house, or was he on the block down the street or towards the corner? Your Honor, the evidence in the case did not explicitly state whether he was outside his house or even where he resided. The only thing was in the common law record, which was not part of the evidence, which defense counsel raised to say that he lived on the 2100 block, and the people clarified to show that the arrest report reflects he has an address on the 2100 block, but that he was arrested one down from there. But that's not in the, of course, it's not evidence. I was trying to find it, and I'm trying to get you to help me. So if, in fact, he was on his front lawn on the block, would that be on the block if he was on his front lawn in front of his house? Would that be considered on the block? No, Your Honor. Under the trial court's understanding of the term on the block, as the officer used it, it was understood to mean that he was on the public area of the block, not on his private property. On the block was specifically understood to mean out on the block, on the block. He's on the public way. It's not on a lawn. It's not like Laubscher. This is just a case where defendant's on the public way, and the court would have to exercise its deference towards the trial court and the findings of fact and agree the defendant was indeed on the public way here. Defendant's final argument today is that the people failed to prove beyond a reasonable doubt that he had knowledge that the firearm was defaced. That goes towards defendant's conviction, of course, for defacement of the identification marks of a firearm. Just to begin with, as stated in the people's brief, this decision has been clearly dealt with in People v. Stanley. That was this court's decision, I believe, in 2009, although certainly it's in the people's brief. And that decision clearly shows that the mens rea goes to the possession, and the people need only show that defendant was in possession of the firearm and requisite knowledge of the unlawful possession of this firearm. And certainly the people showed that beyond reasonable doubt. The purpose of this statute, and defendant's not saying that the statute is unconstitutional on these grounds, although later, of course, he argues under the Second Amendment that it's unconstitutional. But for this issue, defendant is not arguing that defacing identification marks of a firearm statute is unconstitutional. And here, the people showed that he knowingly possessed the firearm. And the legislature's intent, as explained in Stanley for this statute, is that it just stops the possession of this particular type of weapon, which is a defaced firearm. And so this is a possessory offense. The people showed the knowledge. And indeed, the evidence at trial, I mean, fundamentally this should be an issue because the evidence at trial really did show he knew about the defacement, where it had a large scratch mark through it, according to officers, and defendant admits he brought it through legal channels. The knowledge was shown all the way through, and certainly under Stanley, which is the prior decision this court should follow, the people proved defendant's guilt beyond a reasonable doubt. And for those reasons, and those cited or given in the people's brief, we request that this court affirm defendant's convictions for aggravated unlawful use of a weapon and defacing identification marks of a firearm. Thank you. Some quick remarks and rebuttal, Your Honors. First, the state argues that there should be less corroboration required here for an anonymous tip because of the risk to the public presented by the gun. This argument was specifically presented to the Supreme Court in People v. J.L. that there should be essentially an exception to standard reasonable suspicion requirements in the case of gun possessory offenses, and the court rejected it, saying that unless there's some reason to believe that there's an actual imminent emergency, like a gun fight that's about to break out, the mere possession of a gun does not lessen the amount of suspicion that has to be shown for a search. The state also tried to draw some distinctions between this case and J.L. that aren't reflected in the Supreme Court's decision in that case. There was no argument in J.L. that the tip was stale and couldn't be relied on. The detail of the amount of clothing that they gave in the description of the person isn't relevant to the reliability of the tip, because regardless of whether or not the tip is sufficient to pick out a particular person, unless the tip contains additional predictive information that the police can corroborate that would suggest the informant has a way of knowing about concealed details of crime, there's no corroboration, and the tip is no more reliable than it otherwise would be. Also, the state misstates the Harris case slightly, saying that in that case the trial court determined that the area was not a high-crime area. Although that was true, the only testimony in Harris regarding whether or not the area was a high-crime area came from one state witness and was not contradicted. And the general rule is that a fact finder cannot ignore uncontradicted testimony unless it's in some way inherently unbelievable or unreliable. So the appellate court in Harris held that undetailed conclusory testimony that an area is a high-crime area is inherently unreliable. And one last thing. The most important issue in this case is whether or not the police had reason to believe that the informant essentially could be traced again by the police if the police wanted to, that there was a serious chance of that, and that consequently the informant had a reason to tell the truth. The state here was asked what evidence it would present against Mr. Reinhart at a retrial, and there was no suggestion that even the state thinks that the police is going to make an effort to locate this informant again in an effort to find out what this informant would do or if she could provide new evidence, even if it becomes necessary to the basic prosecution. When the state doesn't know that it has to make the argument in order to win the Fourth Amendment argument, even it doesn't think that there's any serious chance that this informant is anything but gone. In light of that, the reasonable and proper result in this case is to conclude that this tip was unreliable because the police did not have any reason to conclude that the informant had an incentive to tell the truth or a history of telling the truth. Unless there's any further questions, I would urge this Court to reverse both of Mr. Reinhart's convictions outright. Thank you, counsel. The arguments were excellent on both sides. We want to thank you very much. We'll take this under advisement, and this Court is adjourned.